WILLIAM G. MEYERS, Executor, et al., Appellees, v. FREDERICK A. SCHMIDT, Appellant.

No. 42932.

JUNE 21, 1935.

REHEARING DENIED SEPTEMBER 27, 1935.

Rice & Rice, and Underhill & Miller, for appellant.

L. G. Atherton, and Prichard & Prichard, for appellees.

PARSONS, J.—William C. Meyers, the executor of the will, under appointment of the probate court of Moody county, S. D., in which county Flandreau is situated, testified that Hinrich Schmidt died May 14, 1933, and that he owned three farms in South Dakota, consisting of the 600-acre farm, and two others of about 1,160 acres, and a residence property in Flandreau, and that in April, 1931, the Monona county farm was deeded to Frederick Schmidt, and the deed was drawn in the office of Mr. Rice, an attorney in Flandreau, in April, 1931, and that there were present at that time Herman Schmidt, Bill Schmidt, Fred Schmidt, and himself; that Fred said when he got the deed he was going to hold it for the estate. The executor did not know whether the statement was made before or after the deed was delivered. He said the profits of the property were all to go in to pay for some of the debts at the bank, and on some other mortgages. In response to the question as to whether there was anything said about it being used for the support and care of Hinrich Schmidt, he answered "Yes, we are going to keep that—Fred and Will, we all said so." Fred said that was all right; it was to keep his father just as long as he lived. He testified there were other talks, when Fred said he was going to hold the place in Iowa as long as his father lived, and then it was going to be turned over to the estate.

At the same time the deed was made to Fred to the Monona county land, the residence in Flandreau was deeded to August Schmidt, and the home farm of 600 acres was deeded to William C. Meyers, and that Meyers afterwards deeded this property to Fred, telling him that as long as he was holding one property he might as well hold it all.

On cross-examination, in reference to the Monona county, Iowa, land, he said, "It is in the bottom on the Missouri River, and has been cut by the river quite a lot", and he did not know what was its worth. He also said that in Rice's office "we

talked over Mr. Schmidt's financial condition; we talked about the mortgage on the South Dakota land, and that the Iowa land was clear. It was talked that the mortgages were big and would probably take the land. We talked of a deficiency judgment also.'' That it was talked over that Mr. Schmidt could not pay the mortgage on the Hendy ranch consisting of 1,100 acres, and that it would be foreclosed. All this property was heavily encumbered. There were over $57,000 of first mortgages on the two farms, and $20,000 in a second mortgage on at least one of them. Hinrich Schmidt died May 14, 1933. Prior to his death, and on the date the deed in question was drawn, about the 25th of April, 1931, he and the plaintiff and defendant and two other sons talked over the affairs of the father, and it was finally agreed that a deed to the Flandreau property should be made to August Schmidt, a deed to the home farm should be made to Meyers, and a deed to the Monona county, Iowa, farm made to the defendant herein. They all went to the office of Rice & Rice, an old legal firm in Flandreau, talked the matter of Schmidt's financial situation over, and about the mortgages which would probably take the land and leave a deficiency judgment. It was understood that the deeds were drawn so the insurance company could not get the balance of the land, and particularly the Monona county land, which was clear of encumbrance; that this land was to be saved to take care of Hinrich Schmidt so long as he lived; that it was not known what would be needed for his care. At that time the old gentleman was physically and mentally able to take care of business, and was 67 years old, and it was said there at that time that he wanted the farm in Iowa to take care of him while he lived, and Fred said he would deed the land to the estate when his father passed away. It was also said in the talk in the law office at that time, and the testimony is undisputed on this, that the property was deeded to August while the father was living. The parties all met at defendant's house afterward, and it was agreed that Fred should be paid for taking care of his father, and was to have a monthly allowance for taking care of him. A daughter testified that the Monona county land in question was to take care of her father while he lived, and after his death was to be equally divided among the children. So the net result of the testimony at this point was that the land deeded over to the defendant was so the father would be sure to have

something to take care of him while he lived. Not long after this the father came to Fred's to live, and there was an understanding that Fred was to be paid for taking care of his father. No amount was fixed. . Fred and his wife thought they ought to have $24 a week, but the rest thought $13 a week enough, but no agreement was made. The old gentleman lived at Fred's for a year and a half. For the first six or seven months he was not so much trouble, but at the close of that time he had a hemorrhage or stroke, and he became absolutely helpless, and had to be dressed and undressed, cared for as a child, had no control of himself, required constant attention, had to be helped to eat, and his condition continued such for eleven months, until he died. That this lack of control was not only physical but mental as well. He had to wear diapers like a baby and be cared for as a child for the whole of eleven months.

One of the attorneys in the office where the deed was drawn testified that he knew that the real estate in South Dakota was so heavily encumbered it would not pay out, and that the second mortgage of $20,000 would be absolutely cut out by the foreclosure of the first mortgage, and that that was one of the reasons for making the deeds; that the old man understood fully what he was doing at that time. On cross-examination Mr. Rice the attorney said he knew the people were trying to save their property, "call it fraud if you will". He said he understood they did not want the holder of the second mortgage to get the Iowa land. In response to the question as to whether or not he was trying to assist these people to defraud their creditors, he said, "You can put it that way if you want to." There were only 105 acres of this land under cultivation. There had been about 200 acres, but it was washed away by the Missouri river until there was left only about 150 acres, but much of it is low, wet land. Three witnesses acquainted with the value of the land placed it as worth about fifteen to twenty-five dollars per acre.

The attitude of the defendant in this case, the record discloses, has been fair. All through the testimony runs the statement in regard to the Monona county land being deeded to the defendant to save it for the care of the father during his lifetime; he did not know what it would take; that Fred took care of his father for the last eighteen months of his life. In the arrangements the home farm of 600 acres was deeded to Meyers. Meyers subsequently, probably becoming alarmed at the

size of the mortgages, deeded it to the defendant. The defendant collected the rents, etc., and he paid out of the rents $2,000 to a bank in Flandreau, and $300 for his father's funeral expenses.

The plaintiffs themselves, in rebuttal in the case, introduced Exhibit 18 into the evidence, a transcript of the examination held before the probate court in Moody county, South Dakota, on December 31, 1933, in which matter the defendant was called as a witness, and the transcript was of his testimony. Therein the defendant claimed to own the land by reason of his father having told him and his wife and others that the land was his and to keep it. He also testified as to the claim against his father's estate for his care and keep, which was right, and to having had several talks with Meyers and other members of the family about his claim, and that he had had no settlement of same; that his claim was for $2,200, and he said, "I am willing to turn over the Iowa land if my claim is paid."

The defendant was never paid a dollar for the eighteen months he cared for his father, which eighteen months included eleven months just prior to his death, during which time he was so helpless as to need extraordinary care. None of the other members of the family seemed able to, or cared to, keep the father. They all wanted Fred to keep him, as the record discloses, and we think that the amount asked by Fred for the keep of his father in view of all the circumstances testified to concerning the care he needed, that $2,200 is a low claim; that such service is worth fully that amount. So the defendant had a legitimate claim against this property. It was deeded to him primarily that the father might have something to live on; that he might be kept by that land so long as he lived, and Fred, having the land, kept the father, and his claim should have been allowed.

The court below in this case entered a decree that the deed should be set aside and the land should be turned over to the executor and handled as a part of the estate. We are not satisfied with this decree. It does not look right that the defendant should be relegated to now filing his claim against the estate in Moody county, South Dakota, in which there is practically nothing, as the evidence shows, and be compelled to give up the title to this land without having his claim adjusted. The evidence shows the land to be worth not more than fifteen to twen-

ty-five dollars an acre. So we are of the opinion, and so hold, that the decree entered in this case should be modified to this extent, and, as modified, remanded, and that the costs of this proceeding should be taxed to the plaintiff.

The decree in this case should be modified by holding that the land in controversy herein, on the payment to the defendant of $2,200, with interest at six per cent per annum from the 8th day of September, 1934, that being the date of the entry of the decree in the court below, shall be deeded or surrendered to William C. Meyers, the executor, and that such payment to the defendant be made on or before the first day of November, 1935. And that, unless such payment is so made to such defendant in satisfaction of his claim for the keep of his father, and on or before said first day of November, 1935, judgment shall be entered for the defendant dismissing the petition of the plaintiffs, and that the entire costs of this case in the district court and in this court shall be taxed to the plaintiffs.

We are satisfied that this is the proper disposition of the case for the following reasons:

The defendant could not be compelled to re-deed the property, because the evidence shows conclusively that the deed was made with the intent to defraud the creditors, and especially the holder of the second mortgage on the farm of the father, deceased. And for the further reason that one of the objects in making the deed was to protect the deceased, and we gather from that it was to take care of the father while he was alive, and his property was all deeded away, part of it to Meyers, the plaintiff herein, as executor. But Meyers in turn deeded that property to the defendant, who held it for some time and paid off a large amount of the debts of the deceased, and that all of the parties interested in this case adverse to the defendant were, under any other theory, liable for the expense in caring for the father, as well as the defendant; and they all refused and failed to assist in the care of the father; and further that, after making of the deed, the father told the defendant that the land was his; told defendant's wife that the land was to be his; told various other parties that the land was the defendant's and that he intended the defendant should have it. The evidence conclusively shows these facts, all of them, so it is but fair to presume that the defendant in this case relied upon this in assisting in taking care of his father, but he took care of him, and

his bill for that care is very reasonable, and he should be paid before he is compelled to give up the land. It is urged that a constructive trust, or a trust ex maleficio, was established. Cases are cited to that effect. We have examined them and find that in all these cases in which it was done the intention existed at the time of taking the deed by the grantee therein not to carry it out. The evidence is devoid of any thought of that kind in this case. So, as the defendant himself, by the testimony put in by the plaintiffs, offered to deed the land to the estate upon the payment of his bill, it is no more than just and equitable that he should be protected in that, and therefore we have arrived at the conclusions stated in this opinion.

The motion to dismiss the appeal is overruled, for the reason that the only complaint made to the notice of appeal is that it does not conform to the statutes, in that it is addressed to the attorneys for the plaintiffs. This is strictly in conformity with the statutes, and therefore the motion is not well taken.

There are many questions argued by both parties on this appeal, but, in our view of the case, none of the questions argued arise. As we think the evidence is so clear and satisfactory as to the rights of the defendant in the premises, our findings in this matter are correct. It would be extremely doubtful whether, under this record, the defendant could be compelled to surrender the land in controversy; that, he having voluntarily offered, as shown by his testimony in the hearing on this matter before the probate court of Moody county, South Dakota, to do the right thing, i. e., to surrender the land upon the payment of the claim he had for the keep of Hinrich Schmidt, that to settle the entire controversy the foregoing does equity, decides according to the very right of the matter, and is justifiable and proper. We therefore are of the opinion that this case should be reversed, with instructions to the lower court to enter a decree as herein indicated, with the right of either party to have the decree as modified entered in this court. The decision of the lower court is therefore reversed, with directions to proceed as herein indicated.—Reversed and remanded.

ANDERSON, C. J., and ALBERT, HAMILTON, RICHARDS, and DONEGAN, JJ., concur,